**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 10-4142**

───────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PRADEEP SRIVASTAVA,

Defendant - Appellant.

───────────────

**No. 10-4600**

───────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PRADEEP SRIVASTAVA,

Defendant - Appellant.

───────────────

**No. 10-4720**

───────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PRADEEP SRIVASTAVA,

               Defendant - Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, District Judge. (8:05-cr-00482-RWT-1)

---

Argued: December 10, 2010          Decided: February 18, 2011

---

Before NIEMEYER and KING, Circuit Judges, and Patrick Michael DUFFY, Senior United States District Judge for the District of South Carolina, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Kannon Kumar Shanmugam, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellant. Stuart A. Berman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Paula M. Junghans, ZUCKERMAN SPAEDER LLP, Washington, D.C.; James A. Bruton, Amy R. Davis, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal raises the question of whether Pradeep Srivastava ("Srivastava") made the "substantial preliminary showing" under Franks v. Delaware, 438 U.S. 154 (1978), that is required for him to be entitled to an evidentiary hearing challenging the integrity of an affidavit submitted to support the issuance of a search warrant. This appeal also raises the question of whether the district court properly excluded testimony of Srivastava as hearsay.

We hold that Srivastava did not make the "substantial preliminary showing" required by Franks and, therefore, affirm the district court's ruling on the Franks issue. Furthermore, we hold that the district court properly excluded Srivastava's hearsay testimony. Finally, we find that any issues Srivastava raises as to the interpretation and execution of the March 2003 search warrants will not be revisited by this Court as we have already analyzed these issues in United States v. Srivastava, 540 F.3d 277 (4th Cir. 2008)("Srivastava I"), cert. denied, 129 S. Ct. 2826 (2009).

I.

In early 2003, a criminal investigation was initiated by the Department of Health and Human Services (the "DHHS"), the Federal Bureau of Investigation (the "FBI"), and the

3

government's Office of Personnel Management (the "OPM"), into an alleged health care fraud scheme involving Srivastava, a licensed cardiologist practicing with two associates in Maryland. The federal authorities suspected that Srivastava and his associates were involved in the submission of false claims to various health care benefit programs, in violation of 18 U.S.C. § 1347. As a result, the authorities commenced an investigation into Srivastava's billing practices.

On March 20, 2003, Special Agent Jason Marrero ("Marrero" or "Agent Marrero") of the DHHS Office of Inspector General applied to the United States District Court for the District of Maryland for three search warrants for evidence of federal health care fraud. United States Magistrate Judge William Connelly approved the warrants, which covered Srivastava's two medical offices and his residence. In support of its warrant application, the government submitted an affidavit by Agent Marrero that summarized evidence obtained by the Office of Inspector General, the FBI, and the OPM concerning "allegations that Srivastava's medical group . . . submits false claims to health care benefit programs." The Affidavit asserted that there was probable cause to believe that criminal fraud had been committed by Srivastava's medical group based upon five categories of "[t]he evidence gathered to date [which] shows that Srivastava's medical office has defrauded health care

4

benefit programs. . . ." The warrants authorized agents to search for "the following records, including, but not limited to, financial, business, patient, insurance, and other records related to the business of Dr. Pradeep Srivastava . . . which may constitute evidence of violations of [medical fraud]." The warrants proceeded to authorize the seizure of various specific categories of records, including, "financial records, including but not limited to accounting records, tax records, accounts receivable logs and ledgers, banking records, and other records reflecting the income and expenditures of the business."

On March 21, 2003, agents executed the search warrants. In the wake of the searches, the government abandoned its pursuit of any criminal charges against Srivastava for health-care fraud. Without conceding any wrongdoing, however, Srivastava did enter into a civil settlement with the government involving similar allegations. Based on records seized that indicated that Srivastava had conducted financial transactions with the Bank of India, the government suspected that Srivastava had failed to file a report on a foreign bank account. The government then launched a two-year investigation into Srivastava's tax returns, which uncovered evidence that, in tax years 1998 and 1999, Srivastava had omitted certain capital gains from personal stock-trading activity from his tax returns.

5

On October 12, 2005, the government obtained an indictment from a grand jury in the District of Maryland charging Srivastava with two counts of attempting to evade taxes and one count of making false statements on a tax return.

Before trial, Srivastava moved for an evidentiary hearing pursuant to Franks, 438 U.S. 154, contending that Agent Marrero's affidavit contained several omissions that were intentionally and materially misleading and that had Agent Marrero included the material information on the affidavit, the affidavit would not sufficiently establish probable cause. Srivastava also moved to suppress the tax-related documents seized during the searches on the grounds that they fell outside the scope of the warrants and that, even assuming they fell within the scope of the warrants, they should be suppressed under the "flagrant disregard" doctrine, which mandates blanket suppression when officers act with flagrant disregard for a warrant's terms.

United States District Judge Roger W. Titus held hearings on Srivastava's motion to suppress evidence on March 27, 2006 and June 9, 2006. At the first hearing, the district court denied Srivastava's motion for a hearing under Franks. The district court took evidence at the second hearing.

On August 4, 2006, the district court issued a memorandum opinion and order suppressing evidence. United States v.

*Srivastava*, 444 F. Supp. 2d 385 (D. Md. 2006), reconsideration denied, 476 F. Supp. 2d 509 (D. Md. 2007). The United States appealed pursuant to 18 U.S.C. § 3731. On September 3, 2008, this Court reversed the district court's order, finding no Fourth Amendment violation and no grounds to suppress any of the government's evidence. *Srivastava I*, 540 F.3d 277.

When the case returned to the district court in 2009, Srivastava moved for reconsideration of the March 2006 order denying his motion for a *Franks* hearing. The district court denied the motion. A jury convicted Srivastava of all three charged crimes. In a post-trial motion, Srivastava again sought a *Franks* hearing. The district court denied the motion. The court imposed concurrent sentences of 46 months of imprisonment on counts one and two and 36 months on count three; three years supervised release, including a special condition of release requiring payment of $16,110,160 in restitution to the IRS; and a $300 special assessment. This appeal followed.

## II.

## A.

We first address the district court's refusal to grant Srivastava a *Franks* hearing. In *Franks*, the Supreme Court held that Srivastava may challenge affidavits upon which search warrants are based under the Fourth and Fourteenth Amendments,

and that properly challenged warrants may be voided. 438 U.S. 154. To entitle a Srivastava to a Franks hearing, he must make a substantial preliminary showing that a warrant was procured through false statements intentionally or recklessly made, and that such statements were necessary for establishing probable cause. In other words, in regards to an alleged omission, Srivastava has to make a preliminary showing (1) that the affiant omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause. Because other pre-trial mechanisms exist to protect innocent citizens, Srivastava's burden in establishing the need for a Franks hearing, based on either false statements or material omissions, is a heavy one. See United States v. Jeffus, 22 F.3d 554, 558 (4th Cir. 1994)(citing Franks, 438 U.S. at 171-72). Srivastava's showing must be more than conclusory and requires a "detailed offer of proof," United States v. Colkey, 899 F.2d 297, 300 (4th Cir. 1990), and "allegations of negligence or innocent mistake are insufficient," Franks, 438 U.S. at 171.

False statements include information intentionally or recklessly omitted; however, "the affirmative inclusion of false information in an affidavit is more likely to present a question

8

of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." Colkey, 899 F.2d at 301-02. Failure to include a matter "potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to Srivastava's benefit. The potential for endless rounds of Franks hearings to contest facially sufficient warrants is readily apparent." Id. Accordingly, merely showing an intentional omission of a fact from a warrant affidavit does not fulfill Franks' requirements. United States v. Tate, 524 F.3d 449, 455 (4th Cir. 2008). "To satisfy the Franks intentional or reckless falsity requirement for an *omission*, Srivastava must show that facts were omitted "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." Id. "Stated otherwise, the omission must be "*designed to mislead*" or must be made "in *reckless disregard of whether [it] would mislead.*" Id.

In order to show that the omitted material was "necessary to the finding of probable cause," id.*,* Srivastava must show that the inclusion in the affidavit of the omitted material would defeat probable cause. Colkey, 899 F.2d at 301. Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearings. Id. For an omission to serve as the basis for a hearing under Franks*,* it must be

such that its inclusion in the affidavit would defeat probable cause. Id. Upon making this two-part preliminary showing, Srivastava is entitled to a hearing, at which he bears the burden of proving the allegations by a preponderance of the evidence. See Franks, 438 U.S. at 156. If a Franks hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant "must be voided" and evidence or testimony gathered pursuant to it must be excluded. Id. A warrant that violated Franks is not subject to the good-faith exception to the exclusionary rule. United States v. Leon, 468 U.S. 897, 923 (1984).

## B.

Srivastava alleges that Agent Marrero knowingly and intentionally, or with reckless disregard, omitted material information from his affidavit, and that had the affidavit included such omitted information, it would not have supported a finding of probable cause. Srivastava accuses Marrero of mischaracterizing "a harmless discrepancy in diagnostic codes," "shad[ing] and distort[ing]" innocuous evidence "to make it appear that it reflected nefarious conduct," and swearing out an affidavit that "was intentionally crafted" to mislead the magistrate and contained "little if any" evidence that "was untainted by the government's pervasive omissions and spin." However, we find that a careful examination of the facts

10

demonstrates that Agent Marrero's affidavit did not contain knowing and intentional material omissions. Therefore, we find that the district court properly denied Srivastava's request for a Franks hearing.

Agent Marrero submitted a 19-page affidavit that summarized evidence concerning allegations that Srivastava's medical practice submitted false claims to health care benefit programs. Agent Marrero established probable cause by setting forth five categories of evidence: (1) billing for services not rendered; (2) billing for duplicative services through two different CareFirst plans; (3) listing inappropriate diagnosis codes on claims; (4) billing for incidental services, which is charging for services that are already included in the primary diagnostic or treatment procedure billed; and (5) altering medical records. We will discuss Srivastava's allegations in relation to the five categories of evidence set forth in the affidavit to establish probable cause.

1.    Billing for Services Not Rendered.

The affidavit outlined evidence that Srivastava was billing for services not rendered. To examine Srivastava's billings, the government hired Dr. David A. Rawling, a consultant and practicing cardiologist. In June 2001, Dr. Rawling reviewed spreadsheets that described services and procedures that Srivastava's office billed for three CareFirst patients and

three Medicare patients. Dr. Rawling concluded (1) that Srivastava's billing of combined right and left heart catheterizations covered by Current Procedural Technology ("CPT") code 93526 appeared to be excessive, because fewer than ten percent of cases justify procedures that include a right heart catheterization or combined left and right heart catheterizations; (2) that Srivastava consistently billed for services already included in the primary diagnostic procedure; and (3) that Srivastava appeared to be adding procedures or services to bills to maximize reimbursements.

In November 2002, Dr. Rawling examined hospital patient records for nine of Srivastava's Medicare patients, including records concerning sixteen dates of service in 2000 for which Srivastava's office billed Medicare using CPT 93526—the billing code for a combined right and left heart catheterization. In fifteen of those sixteen instances, Dr. Rawling found that the hospital records did not show any right heart catheterization being performed, nor any change in right heart pressure that would be associated with a right heart catheterization. Billing for a combined right and left heart catheterization rather than a left heart catheterization alone increased the Medicare payment by $141.85. Dr. Rawling advised that he detected "a consistent pattern of over-billing, billing for procedures not performed, or billing inappropriate codes."

12

Dr. Rawling's observations were corroborated by Dr. Bruce Lloyd, another cardiologist who reviewed the medical records for Srivastava's treatment of a CareFirst member. Srivastava billed CareFirst for a combined right and left heart catheterization, but Dr. Lloyd concluded that "in each situation, only a left heart procedure was done. No right heart study was done, but it was billed. This is fraud."

At the hearing on Srivastava's initial motion for a <u>Franks</u> hearing and on appeal, Srivastava claims that in this section, Agent Marrero omitted information so as to make the evidence appear more suspicious than it actually was. Srivastava claims that Agent Marrero's affidavit omitted information that in some cases where Srivastava's office billed for right and left heart catheterizations, Srivastava had actually performed a left heart catheterization and had "inserted a venous sheath into the patient's right heart." Srivastava claims that Marrero failed to tell the magistrate judge that Srivastava actually lost money by billing for a combined right and left heart catheterization rather than for two separate procedures of a left heart catheterization and right heart venous sheath. Srivastava argues that while "it was arguably incorrect to bill for the combined procedure as a right and left heart catheterization," Agent Marrero still should have included information in his affidavit that Srivastava had performed a right venous sheath in some

13

cases. Srivastava argues that "if Agent Marrero had disclosed to the magistrate that the alleged miscoding identified in this section of the affidavit often redounded to Srivastava's financial *detriment,* instead of his benefit, the magistrate would presumably have determined that the allegations in this section did not support the conclusion that Dr. Srivastava was engaging in health care fraud." Srivastava's allegation is based on entries in Dr. Rawling's notes concerning his review of Srivastava's claims for combined right and left heart catheterization. In two instances, Dr. Rawling wrote "no RHC (right heart catheterization), just venous access." In a third, he wrote: "no RHC. Cath lab procedure report only indicates venous sheath placed." In other instances, he reviewed laboratory records and simply wrote that "no RHC" had been performed.

At the district court hearing, Srivastava offered no evidence that Agent Marrero knew Srivastava had placed a "venous sheath" in or near the right heart or knew, believed, or deliberately omitted information that such an action was medically equivalent to performing a right heart catheterization or could be billed as such. As a result the district court rejected Srivastava's argument.

We agree with the district court that while Srivastava claims that Agent Marrero should have disclosed that Srivastava

14

could have billed separately for the venous sheath procedure and that had he done so he would have actually billed *more* for the procedure, the record is devoid of any evidence (1) that Marrero knew that Srivastava had conducted any venous sheath procedures, (2) that he was aware that Srivastava could have billed more for a left heart catheterization and a right venous sheath than for a combined right and left heart catheterization, or (3) that he intentionally omitted such information from his affidavit.

Srivastava points to Dr. Rawlings notes and Dr. Rawling's memorandum summarizing his findings as evidence that Agent Marrero knew that Srivastava conducted venous sheath insertions for which he did not bill. However, a review of Dr. Rawling's notes and memorandum indicates that Agent Marrero could not have inferred from Dr. Rawlings findings that Srivastava performed a venous sheath, which could have been billed for separately, and that billing for a right and left heart catheterization together, while erroneous, actually resulted in a lower amount paid to Srivastava. Additionally, Dr. Rawling's notes indicating that a venous sheath was performed in *some* of the instances does not explain the remaining instances where Srivastava billed for a right and left heart catheterization and did not perform a right catheterization or a venous sheath. The district court correctly concluded that Srivastava failed to make a preliminary showing that Agent Marrero omitted facts with

15

the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading with respect to this section on Billing for Services Not Rendered. The information that Agent Marrero included in his affidavit accurately depicted the overall findings of Dr. Rawling's as to Srivastava's billing for services that he did not render.

2. Billing for Duplicate Services.

The affidavit also outlined evidence that Srivastava submitted duplicate bills for the same services to two different CareFirst entities. As background, Agent Marrero described how, in May 1997, BlueCross BlueShield National Capital Area ("BCBSNCA") placed Srivastava on "pre-payment review" because of concern about possibly fraudulent or inappropriate benefits, and required Srivastava to submit supporting medical documentation for it to examine prior to deciding whether to pay or reject Srivastava's claims.

The affidavit described that in the case of CareFirst subscriber G.B., Srivastava submitted claims to BCBSNCA, dated February 26, 1999, for eight procedures or services allegedly performed on January 14, 1999. Payment for five of the eight procedures was rejected for lack of documentation. Srivastava then submitted claims dated December 8, 1999 to Blue Cross Blue Shield Maryland ("BCBSM") for seven procedures or services

16

performed on January 14, 1999.  All seven procedures or services had been part of the previously billed February 26, 1999 claims.

In the case of subscriber S.B., Srivastava submitted claims to BCBSNCA and BCBSM, respectively, on August 20, 1998 and November 23, 1999, which both billed for six identical procedures or services that were allegedly provided on August 18, 1998.

In the case of patient, A.F., Srivastava submitted claims to BCBSNCA and BCBSM, respectively, dated March 3, 1999, and December 7, 1999, for four identical procedures or services that were allegedly provided on March 2, 1999.

At the March 27, 2006 hearing, Srivastava barely challenged this section of the affidavit.  Srivastava suggested innocent explanations for sending the same bill to two separate CareFirst entities and contended that the affidavit should have included exculpatory information that a longtime employee of his medical office had told investigators that she was not aware of any billing fraud.

The district court made short shrift of this argument, pointing out that <u>Franks</u> and this Court's <u>Franks</u> cases did not require that every conceivable thing that is said by a person being interviewed must find its way into the affidavit if it's exculpatory in nature.  See <u>Colkley</u>, 899 F.2d at 301.

17

On Appeal, Srivastava claims that the heading, "Billing for Duplicate Services," is misleading. Srivastava claims that Agent Marrero described Srivastava's resubmission of denied claims from CareFirst's National Capital Area plan to its Maryland counterpart and implied—via the section heading—that the resubmission was duplicative and therefore fraudulent. Srivastava argues that this implication was misleading because Dr. Srivastava did not attempt to be paid twice for the same procedures but instead merely resubmitted denied claims in accordance with CareFirst's written procedures.

We find that the district court properly concluded that Srivastava failed to make a preliminary showing that Agent Marrero omitted "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading" with respect to this section of the affidavit. Srivastava has failed to make a preliminary showing that the omission was "*designed to mislead*" or was made "in *reckless disregard of whether [it] would mislead.*" Tate, 524 F.3d at 455. Rather, in this section of the affidavit, Agent Marrero recounts the exact facts of how Srivastava billed two separate providers for the same service. While Srivastava argues that the heading is misleading, when we read the entire affidavit, including a summary of the headings which says "(2) billing for duplicate services through two different CareFirst plans," we

18

find that the district court was correct in finding that Srivastava has failed to make a preliminary showing that Agent Marrero intended to mislead the Magistrate Judge in this section.

3. Listing Inappropriate Codes on Claims.

The affidavit outlined evidence obtained when the FBI sent three male undercover agents, using fictitious names, to receive treatment at Srivastava's medical practice. Before each agent went to Srivastava's office, Dr. Lloyd, a cardiologist and consultant, checked his blood pressure, checked his height and weight, and performed an electrocardiogram. In each case, Dr. Lloyd advised the agent that the blood pressure, weight, and EKG results were normal. After each agent visited Srivastava, Dr. Rawling reviewed the claim forms and the agents' summaries describing visits to Dr. Lloyd and to Srivastava's practice, including information about the date they were seen by the doctors, what services they recalled receiving and by whom, and what if any complaints were noted.

The affidavit recited that after the agents visited Srivastava's practice, the office submitted claim forms containing diagnostic codes for Agent Flores (hypertensive heart disorder; tachycardia, unspecified; secondary cardiomyopathy, unspecified; and other and unspecified hyperlipidemia); Agent Yerdon (two diagnostic codes, including hypertensive heart

19

disorder); and Agent Striebich (two diagnostic codes, including other and unspecified hyperlipidemia). Dr. Rawling reviewed the available records; the claim forms and the agents' summaries describing visits to Dr. Lloyd and to Srivastava's practice. Based on this information, Dr. Rawling found no basis for the diagnoses indicated by the billing codes used by Srivastava's medical practice.

At the 2006 hearing, Srivastava contended that three active FBI agents were not considered to be normal in any time frame that was remotely the same as when they were being seen by Srivastava. This contention was based on brief passages in two FBI form 302 memoranda relating to the agents' visits with Dr. Lloyd. The memoranda indicated that Dr. Lloyd had found EKG results, weight and blood pressure to be in the normal range and had so advised Agent Flores, Yerdon, and Striebich, respectively. But one memorandum indicated that after Dr. Lloyd told Agent Flores that his condition was normal, the agent received a form listing services provided which contained a diagnostic description of "401.1:L Essential hypertension, benign." A second memorandum indicated that documents given to Agent Yerdon contained the same language. No such reference appeared in the memorandum for Agent Striebich. The memoranda did not indicate that Dr. Lloyd told any agent that he suffered from hypertension, and Srivastava presented no evidence that

20

either Dr. Rawling or Agent Marrero was told anything about the phrase "401.1: Essential hypertension, benign." Nevertheless, Srivastava claims these brief references to hypertension on billing forms demand a conclusion that Agent Marrero made knowing false representations about the agents' condition.

The district court rejected this argument. The memorandum for Agent Yerdon listed a blood pressure of 114/74, and the district judge observed that hypertension is not diagnosed "until you get to 140/90 or more." The district court speculated that "maybe this is a case of bad codes, but maybe Dr. Lloyd simply coded the visit as being an evaluation of that possible condition." The district court later ruled:

> Now, much is made by the defense of the fact that at the end of the agent's report of his visit to see Dr. Lloyd, a diagnosis description was put down "essential hypertension benign," and it indicates that notwithstanding everything the agent was told in English, that this coding on a billing sheet indicates that these agents, or at least two of these three agents, had "essential hypertension benign."
>
> My understanding of what "essential hypertension benign" means is that the cause of the hypertension is not known, but there is hypertension. I have no idea why Dr. Lloyd would have put that on his billing records. It may be more of the extraordinary world we live in with medical records that code has to be put down for something. And if a person comes in to see a physician and the physician puts down something is wrong, that they won't get compensated, so they have to put down what the suspected diagnosis is . . . . I don't see anything here that indicates to me that these agents reported to Agent Marrero that they had "Essential hypertension benign." They simply gave him what the records said of the diagnosis code.

21

I would assume from the context of these, that if these agents really did have blood pressure readings taken that were within normal range, that they were in fact told they were normal. So that from the perspective of Agent Marrero, who's trying to portray accurately for Magistrate Connelly the circumstances of these three agents, it is that these are three agents who saw a cardiologist at Georgetown University Hospital; and all three were told they were normal, and they then decided to test what would happen when they went to see Srivastava's medical practice.

So I don't find anything . . . that comes close to meeting the Franks standard on the basis of the statement allegedly made with reckless disregard of the truth here. The highest level I could get this to would be negligent. And even there, if he put down, by the way the, diagnosis code when I left on a sheet of paper was "essential hypertension benign," I don't know that even if that had been intentionally and recklessly made that that would gut this affidavit of sufficient information to negate a finding by the magistrate of probable cause.

Joint Appendix at 602-04.

On Appeal, Srivastava claims Agent Marrero intentionally misled the magistrate about the results of the undercover investigation in the way that he described the results of the investigation. Srivastava argues that "the government undertook its undercover investigation for the specific purpose of catching Dr. Srivastava in the act of committing health-care fraud. . . . However, when it became clear that Dr. Srivastava had not committed fraud because he had performed and billed for altogether appropriate procedures for the three undercover agents, the government went to elaborate lengths to generate

22

evidence suggestive of wrongdoing." First, Srivastava claims that agent Marrero entirely excluded from the affidavit the most relevant results of the undercover investigation: "namely, that the investigation produced no direct evidence of health-care fraud, because Dr. Srivastava billed only for procedures that he appropriately performed on the undercover agents." Second, Srivastava claims that Agent Marrero "drew the magistrate's attention to the discrepancy in diagnostic coded that Dr. Rawling eventually identified without explaining the significance of the diagnosis codes or revealing that Dr. Rawling was not provided with the medical records that would have allowed him to determine if there was a basis for the diagnosis or not." According to Srivastava, "the overall effect of Agent Marrero's statements concerning the undercover investigation, then, was to leave the magistrate with the impression that the investigation had succeeded when it had in reality completely failed."

We find that Srivastava's attack on the undercover investigation section of the affidavit presented nothing that comes close to meeting the Franks standard on the basis of statement or omissions allegedly made with reckless disregard of the truth. In his affidavit, Agent Marrero described how Dr. Lloyd checked the undercover agents' blood pressure, checked their height and weight, performed an EKG, and advised them that

23

the results were normal. When the agents visited Srivastava's practice, the office submitted claim forms containing ominous diagnostic codes for Agent Flores (hypertensive heart disorder; tachycardia, unspecified; secondary cardiomyopathy, unspecified; and other and unspecified hyperlipidemia), Agent Yerdon (two diagnosis codes, including hypertensive heart disorder), and Agent Striebich (two diagnostic codes, including other and unspecified hyperlipidemia). Dr. Rawling reviewed the available records—the claim forms and the agents' summaries describing visits to Dr. Lloyd and to Srivastava's practice. Based on this information, Dr. Rawling found no basis for the diagnoses indicated by the billing codes used by Srivastava's medical practice. This is exactly what happened according to the record, and Agent Marrero accurately described for the Magistrate Judge the results of the investigation.

Srivastava claims that Agent Marrero "excluded" evidence that "Dr. Srivastava billed only for procedures that he appropriately performed on the undercover agents." However, Srivastava is making a conclusory statement that Dr. Srivastava's procedures were appropriate. All Agent Marrero knew when he wrote the affidavit was that Srivastava billed for a variety of diagnostic codes that were inconsistent with Dr. Lloyd's diagnoses of three healthy FBI agents. Second, Srivastava claims that Agent Marrero excluded information that

24

Dr. Rawlings made his opinion without being provided with the medical records that would have allowed him to determine if there was a basis for the diagnoses or not. However, given that the affidavit was submitted in support of applications for search warrants to *obtain* Srivastava's medical records, Agent Marrero hardly concealed the fact that Dr. Rawling had not been provided with Srivastava's medical records. Therefore, we affirm the district court's finding that nothing Agent Marrero included or failed to include in his affidavit comes close to meeting the <u>Franks</u> standard for statements or omissions "*designed to mislead*" or made "in *reckless disregard of whether [it] would mislead.*" <u>Tate</u>, 524 F.3d at 455.

4.   Billing for Incidental Services.

The affidavit also contained evidence of a form of double-billing. Agent Marrero explained that descriptions of procedures as defined by the CPT Code Book included all services necessary to accomplish the primary diagnostic or treatment procedure, even if an independent CPT code covers the specific service. For the relevant time period, the CPT Code Book definition of cardiac catheterization included, among other things, the introduction, positioning, and repositioning of catheters.

In the case of patient A.B., however, Srivastava's office submitted one claim to Medicare for a combined right and left

25

catheterization (CPT 93526) on March 8, 2000, and also billed for ten other procedures, including the introduction of the catheter into the aorta (CPT 36200). Introducing the catheter into the aorta is an included service in the primary diagnostic procedure CPT code 93526. The same form of double-billing occurred with respect to service provided to patient J.W. on July 20, 1999, and patient L.S. on September 14, 2000.

In response to the results in these cases, Agent Marrero recited that E.S., a former employee of Srivastava's, told an FBI agent that Srivastava used multiple billing codes and billed for duplicative services, such as an electrocardiogram and its interpretation. E.S. reported that she had worked for another doctor who only billed one code for an EKG.

Srivastava's primary criticism of this section of the affidavit was that Agent Marrero should not have relied on information from E.S. because her former employer was a gynecologist, not a cardiologist. Srivastava also claimed that Agent Marrero's affidavit mischaracterized E.S.'s statements, when in fact the affidavit closely tracked the interview memo. The district court found no problem with this portion of the affidavit, and Srivastava abandoned this issue in his motion for reconsideration and in his post-trial motion.

On appeal, Srivastava does not allege that Agent Marrero made any misleading statements or omissions in regard to this

section. Therefore, we adopt the district court's finding that the Affidavit did not contain intentional, material false statements or omissions relating to billing for services not rendered.

     5.    Altering Medical Records.

Finally, the affidavit contained evidence of altered medical records. For example, Srivastava's office billed CareFirst twice for six laboratory procedures or services provided to patient S.H. The dates of service were allegedly November 2 and 3, 1998, but the affidavit stated that "the documentation provided for the November 3rd date of service appears to be altered because a '3' is handwritten over where the typewritten '2' appears to be in the date '11/02/1998.'" In the case of patient O.B., Srivastava's office billed CareFirst for four procedures (CPT 93307, 03320, and 93325) allegedly provided on November 24, 1997, and for six procedures (including the same three CPT codes) allegedly provided on November 26, 1997. The office submitted two EKG reports as supporting documentation for both alleged dates of service, but the affidavit stated that "the documentation provided for the November 24th date of service appears to be altered because a '4' is handwritten over where the typewritten '6' appears to be in the date '11/26/1997,'" The two Echocardiography Reports

27

appear to be identical with the exception of the handwritten '4.'"

At the 2006 hearing, Srivastava did not contend that this section of the affidavit was false. Instead, Srivastava claimed that Agent Marrero failed to include exculpatory information provided by Srivastava's longtime billing manager, who denied any improprieties. The billing manager insisted that "Dr. Srivastava had never asked [her] to do anything improper about the billing," and expressed the view that the alterations were "mistakes and corrections." Srivastava also claimed that at least one set of documentation revealed that Dr. Srivastava had in fact performed two different tests that yielded different results. Srivastava claimed that these omissions were intended to mislead the magistrate into viewing these altered records as attempts at double billing for the same procedure.

The district court found that the affidavit was accurate because the records were altered and found that this section of the affidavit was included to show alteration, not to demonstrate double-billing. The court did not find anything that is misleading or comes close to the reckless disregard for the truth standard under Franks with regard to the reference to the altered medical records. The district court found that it certainly appeared that these records were altered.

28

In his motion for reconsideration, Srivastava claimed that Agent Marrero had an obligation to disclose exculpatory assertions by the billing manager. Srivastava further claimed that the November 3, 1998 results were different from the November 2, 1998 results, proving that two sets of tests had been performed. Because this evidence did not negate the essential point made by this section of the affidavit—that the dates on records had been altered, providing additional evidence that the medical practice was engaged in fraud—the district court denied the motion.

On appeal, Srivastava acknowledges that this section of the affidavit accurately recites that his office billed CareFirst twice for procedures or services for patients S.H. (alleged dates of service November 2 and 3, 1998) and O.B. (alleged dates of service November 24 and 26, 1997), and that in each instance, the second claim contained a handwritten alteration of the date on a medical record. The affidavit included these two paragraphs as a fifth and final category of evidence that Srivastava's medical office was engaged in fraud. However, Srivastava argues that Marrero implied that the changes had been made so as to permit submission of two claims for only one set of underlying services, and then argues that Marrero intentionally omitted, with the intent to mislead, records indicating that two sets of procedures were conducted with respect to S.H., as well as

29

exculpatory information provided by Srivastava's longtime billing assistant. Srivastava argues that without those pieces of omitted information the Affidavit leaves a reviewing judge with the misleading impression that the alterations were suspicious.

We find that, with respect to this part of the affidavit, Srivastava failed to make a preliminary showing that Agent Marrero omitted information "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." Stated otherwise, Srivastava has failed to make a preliminary showing that the omission was "*designed to mislead*" or was made "in *reckless disregard of whether [it] would mislead.*" Rather, in this section of the affidavit, Agent Marrero accurately recounts the facts of how Srivastava's office altered medical records by changing the dates on the records. Srivastava claims that this section is misleading because it implies double-billing without providing an exculpatory statement by Srivastava's employee and without providing records that, in fact, two procedures were performed on patient S.H. However, nothing in the affidavit states that the altered medical records are evidence of double-billing. Additionally, this Court's rulings in <u>Colkley</u> and <u>Jeffus</u> make clear that not all information which might constitute <u>Brady</u> material at a later

stage of the criminal process needs to be included in a search warrant affidavit.

Therefore, after reviewing all sections of Agent Marrero's affidavit, we find that the district court properly denied a Franks hearing. As explained in detail above, the district court correctly found Srivastava failed to make a preliminary showing that there were false statements or omissions in the affidavit that were made by Agent Marrero with the intent to mislead the magistrate. Additionally, even if we were to find some of the various omissions mentioned above to have been made intentionally or in reckless disregard for the truth, the excision of one or even two of them under the circumstances of this case would not undermine the finding of probable cause from this affidavit, considered as a whole.

## III.

The District Court initially granted Srivastava suppression of the evidence seized pursuant to the search warrants on the ground that the officers acted with "flagrant disregard" for the terms of the warrants in executing them. On the government's earlier interlocutory appeal, however, a panel of this Court reversed the district court's decision, holding that the "flagrant disregard" doctrine was inapplicable. Srivastava I, 540 F.3d 277. Srivastava again raises this issue in this appeal;

31

however, under the law-of-the-case doctrine, we are foreclosed from revisiting the earlier panel's holding. See United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999)(rulings that constitutes law of the case "should continue to govern the same issues in subsequent stages in the same case").

IV.

Lastly, we address Srivastava's contention that the district court improperly excluded Srivastava's proffered testimony as to the issue of intent in the tax evasion case. As part of the tax evasion case presented at trial, the Government had to show that Srivastava acted willfully when he allegedly failed to disclose certain capital gains on his tax returns. As part of proving that willfulness, the Government presented evidence that Srivastava made multiple transfers to bank accounts in India. Specifically, on July 16 and 21, 1999, with his broker Sohan Aggarwal's assistance, Srivastava sent outgoing wire transfers of $440,000 and $465,000 from Bentley-Lawrence accounts for deposit in his accounts in India. In December 1999 and January 2000, Srivastava sent four wire transfers from the U.S. to India.

In regard to the evidence of wired transfers to India, Srivastava wished to introduce testimony from his broker, Aggarwal, that Srivastava told him "during the period of the

32

rising market in 1998 and 1999" that he "went to India and then he said, hey, guys, look, why—I have decided to build a charity hospital. Okay, fine. Where is the money? Well, you tell me when you want to send the money, I'll send the money." Joint Appendix 1961. Srivastava wished to introduce this testimony to controvert the Government's argument that Srivastava was transferring money to India to purposefully evade taxes.

The district court excluded this testimony because it found that it was hearsay not subject to an exception. Srivastava argues that the district court erred by not applying Rule 803(3), a hearsay exception, in order to allow the testimony.

We review decisions to admit or exclude evidence for abuse of discretion. United States v. Forrest, 429 F.3d 73, 79 (4th Cir. 2005). Under that standard, we may not substitute our judgment for that of the district court; rather, we must determine whether the district court's exercise of discretion, considering the law and facts, was arbitrary or capricious. United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995). Whether reviewed only for abuse of discretion or *de novo,* any error in the admission or exclusion of evidence is subject to the harmless error test. See Delaware v. Van Arsdall, 475 U.S. 673, 680-84 (1983).

Rule 803(3) provides an exception for hearsay statements when the statement represents "a statement of the declarant's

then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)." Fed. R. Evid. 803(3). The threshold requirements for invoking this hearsay exception are that (1) the statement must be contemporaneous with the mental state sought to be proven; (2) there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case. United States v. Neely, 980 F.2d 1074, 1083 (7th Cir. 1992); United States v. Faust, 850 F.2d 575, 585 (9th Cir. 1988). On the question of relevance, "the declarant's statement of mind must be relevant to some issue in the case before such testimony can be admitted under Rule 803(3)." United States v. Veltmann, 6 F.3d 1483 (11th Cir. 1993). "Where state of mind itself is in issue [as intent was in this case], the court must determine if the declarant's state of mind *at the time of the declaration* is relevant to the declarant's state of mind *at the time at issue.*" United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir. 1980) (emphasis added).

The district court excluded the proffered testimony on three grounds: (1) failure to satisfy the requirement of contemporaneousness, because Srivastava's statement to Aggarwal preceded the largest transfers to India and the filing of the

34

1998 tax return by months and preceded the filing of the 1999 and 2000 tax returns by years; (2) irrelevance of the evidence to the intent issues in a tax evasion case; and (3) pursuant to the balancing test of Rule 403.

We find that district court properly concluded that the statement was irrelevant to the core issue in the case—whether Srivastava willfully evaded income taxes on $40 million of capital gains. As stated by the United States in its brief "[t]he intended *end use* of the $5 million in untaxed income once it reached India, however, had no bearing on Srivastava's specific intent to commit tax crimes. A person who is required by law to accurately declare his income and pay taxes cannot evade that requirement by promising to use the fruits of tax evasion for a good cause. It made no difference whether Srivastava transmitted funds to India with the intent to open a hospital, build a vacation home, or finance a software company. Srivastava's claim that his stated intent to build a hospital 'rebutted the government's contention that the purpose was instead to hide the transferred funds from the IRS' is simply without merit." Because we find the statements to be irrelevant to the intent issue in the tax evasion case, the testimony does not meet the requirements for a hearsay exception under Rule 803(3). Therefore, we affirm the district court's exclusion of this testimony.

35

V.

For the foregoing reasons, we affirm the district court's denial to conduct a <u>Franks</u> hearing; refuse to reconsider any arguments about the previously appealed motion to suppress under the law-of-the-case doctrine; and affirm the district court's exclusion of proffered hearsay testimony.

<u>AFFIRMED</u>